L. Trevor Grimm, State Bar No. 186801
Michelle B. Ghaltchi, State Bar No. 242482
MANNING & MARDER
KASS, ELLROD, RAMIREZ LLP
15th Floor at 801 Tower
801 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 624-6900
Email: ltg@mmker.com, mbg@mmker.com

Attorneys for Defendants
COUNTY OF LOS ANGELES, DEPUTY CRISTINA MARTINEZ,
DEPUTY CASEY CHESHIER and DEPUTY ADAM PRUITT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES (JIM) OWENS,<br><br>                    Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, DEPUTY MARTINEZ, DEPUTY SHESHIRE, DOES 1-10, inclusive,<br><br>                    Defendants. | Case No.: CV08-07116 DMG<br><br>**DECLARATION OF MICHELLE GHALTCHI IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION OF ISSUES**<br><br>Trial Date:   October 4, 2010<br>PTC Date:   September 27, 2010 |

I, Michelle B. Ghaltchi, state and declare as follows:

1.      I am an attorney licensed to practice law in the State of California and in the United States District Court, Central District of California. I am a member of the law offices of Manning & Marder Kass Ellrod Ramirez LLP, attorneys of record for defendants County of Los Angeles, Deputy Cheshier, Deputy Pruitt, and Deputy Martinez ("defendants") in this action. If called and sworn as a witness to testify I am competent to testify and would testify from my own personal knowledge as to the facts set forth in this declaration.

2.      On June 18, 2010, as required by Local Rule 7-3, correspondence was sent to plaintiff's counsel prior to the filing of this motion.

3.    Attached hereto and incorporated herein by reference as Exhibit A is a true and correct copy of Plaintiff's Government Tort Claim filed on March 11, 2008.

4.    Attached hereto and incorporated herein by reference as Exhibit B are true and correct copies of the relevant portions of plaintiff James Owens' deposition testimony, taken February 25, 2010.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed July 19, 2010 at Los Angeles, California.

_____
Michelle B. Ghaltchi

EXHIBIT "A"

MAR 1 2 2008

## LOS ANGELES COUNTY SHERIFF'S DEPARTMENT
## CLAIM FOR DAMAGES TO PERSON OR PROPERTY

FILED

**INSTRUCTIONS:**
1. Read entire claim thoroughly.
2. Fill out the claim completely.
3. This claim form must be signed.
4. Submit original signed copy.
5. Photocopies may be made for your records.

**WARNING**
- Claims for death, injury to person or to personal property must be filed no later than 6 months after the occurrence.
  (GOV. CODE SECTION 911.2)
- All other claims for damages must be filed no later than one year after the occurrence.
  (GOV. CODE SECTION 911.2)
- Subject to certain exception, you have only six months from the date of written notice of rejection of your claim to file a court action.
  (GOV. CODE SECTION 945.6)
- If written notice of rejection of your claim is not given, you have 2 years from accrual of the cause of the action to file a court action.
  (GOV. CODE SECTION 945.6)

2008 MAR 11 AM 9: 13

BOARD OF SUPERVISORS
COUNTY OF LOS ANGELES

TIME STAMP HERE
FOR OFFICE USE ONLY

**1. WHEN AND WHERE DID DAMAGE OR INJURY OCCUR?**

| DATE: | TIME: | STREET ADDRESS OR LOCATION: | CITY: | ZIP: |
|---|---|---|---|---|
| 12/15/07 | 11:40 p.m. | 4147 169th Street | Lawndale | 90260 |

**2. NAME(S) OF SHERIFF PERSONNEL INVOLVED:**

NAME: Martinez (See Attachment) — STATION / FACILITY: Lennox

NAME: Sheshire — STATION / FACILITY: Lennox

**15. WERE THE PARAMEDICS CALLED?** No

**16. DID THE CLAIMANT VISIT A PHYSICIAN?**
PHYSICIAN'S NAME: Robert Fenton, MD
(310) 543-1154
ADDRESS/PHONE: 3475 Torrance Blvd. #F
Torrance, CA. 90503
DATE OF VISIT: 12/17/07

**3. DESCRIBE IN DETAIL HOW DAMAGE OR INJURY OCCURRED:**
(Use attachments if necessary)

THE EVENING OF THE OCCURRENCE I WAS IN MY RESIDENCE WITH MY FIANCEE WATCHING TELEVISION. SHE

WAS IN THE PROCESS OF ADDRESSING CHRISTMAS CARDS. SHE STATED THAT SOME OF THE ADDRESSES WERE OUT

IN HER VEHICLE AND ASKED IF I WOULD RETRIEVE THEM. I WALKED OUT TO HER VEHICLE DIRECTLY IN FRONT OF

THE ABOVE STREET ADDRESS WHEN TWO SHERIFF DEPARTMENT VEHICLES PULLED UP. (Continued on Attachment)

**4. WHY DO YOU CLAIM THE SHERIFF'S DEPARTMENT IS RESPONSIBLE?**

THE SHERIFF'S DEPUTY THAT ASSAULTED AND BATTERED ME IN A NEGLIGENT, CARELESS AND WILFUL MANNER
DID SO WITHOUT PROBABLE CAUSE AND CONTRARY TO THAT WHICH IS SET FORTH IN THE ATTACHED SHERIFF'S

DEPARTMENT HEADQUARTER'S LETTER OF JANUARY 16, 2008.

**5. LIST DAMAGES INCURRED TO DATE (Attach Copy of Receipts & Repair Estimates)**

PERMANENT INJURY TO LEFT KNEE WHICH WILL NECESSITATE SURGERY.

**17. WITNESS TO DAMAGE OR INJURY?**
NAME: NANCY ENGLISH
ADDRESS: 4147 169th St.
Lawndale, CA 90260
CITY/PHONE: 310-227-6046

**6. SHERIFF'S DEPARTMENT FILE OR REPORT#**

| **7. NAME OF CLAIMANT (Print Clearly)** | **8. DRIVER'S LICENSE OR I.D. #** |
|---|---|
| JAMES OWENS | A3519711 |

NAME:
ADDRESS:
CITY/PHONE:

| **9. DATE OF BIRTH** | **10. SOCIAL SECURITY #** | **11. Booking Number (if applicable)** |
|---|---|---|
| 11/12/63 | 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 | |

**12. CORRESPONDENCE ADDRESS - (STREET, CITY, STATE, ZIP)**
Please correspond with my Attorney:
Philip Daigneault, Esq., 3828 Carson Street, #100, Torrance, CA, 90503

NAME:
ADDRESS:
CITY/PHONE:

**TOTAL DAMAGES TO DATE**
$ 15,000.00

**13. HOME PHONE (or phone you can be contacted at) 14. BUSINESS PHONE**
(310) 227-6046       (   )

**TOTAL ESTIMATED DAMAGES**
$ 100,000.00

## THIS CLAIM MUST BE SIGNED
**NOTE: PRESENTATION OF A FALSE CLAIM IS A FELONY (PENAL CODE SEC. 72.)**

| **18. SIGNATURE OF CLAIMANT OR PERSON FILING ON HIS/HER BEHALF:** | **19. PRINT OR TYPE NAME** | **DATE** |
|---|---|---|
| X _(signature)_ | JAMES OWENS | 02/28/08 |

Deliver or mail to Executive Officer, Board of Supervisors, County of Los Angeles, Room 383, Kenneth Hahn Hall of Administration, 500 W. Temple St. LA, CA 90012

SH-AD-672

3

## ATTACHMENT TO CLAIM FOR DAMAGES TO PERSON OR PROPERTY

### Note re No. 2: NAMES OF SHERIFF PERSONNEL INVOLVED:

I am not personally aware of the officers' names. These were names given to Nancy English the following day by a Lieutenant Valencia out of the Lennox Sheriff's Office. He identified himself as being the Watch Commander for the Deputy stating, "He shouldn't have done that."

### Continuation of No. 3: HOW DAMAGE OR INJURY OCCURRED:

One of the deputies shouted from his vehicle for me to put my hands behind my head. I did so and he then exited his vehicle and grabbed my hands and pulled them down behind my back. He started kicking my feet apart and I asked that he please be careful as I had some pain recently in my left knee and he was causing increased pain. He patted me down and when he got to my left knee he hit it stating, "You mean that knee?" He then told me to get into the back seat of one of the sheriff's vehicles and while I was attempting to do so without bending my knee too much because of the pain I was experiencing he simply pushed me in stating, "now you're in."

I have now been advised by an orthopedic surgeon that I have permanent injury to my left knee that will require surgery.

4

EXHIBIT "B"

# CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JAMES (JIM) OWENS,                )
                                  )
                PLAINTIFF,        )
                                  )
        VS.                       )  CASE NO. CV08-07116 DG
                                  )
COUNTY OF LOS ANGELES, ET AL.,    )
                                  )
                DEFENDANTS,       )
                                  )

**DISK ENCLOSED**

DEPOSITION OF JAMES OWENS

TAKEN ON

THURSDAY, FEBRUARY 25, 2010

**NORMAN SCHALL & ASSOCIATES**
Certified Shorthand Reporters

1055 Wilshire Blvd., Suite 1503
Los Angeles, CA 90017
(800) 734-8838
(213) 481-3636 Fax
e-mail: SchallDepo@aol.com
www. SchallCourtReporters.com

**REPORTED BY:**

JACQUELINE M. HARRIS
C.S.R. 7459

Orange County • Inland Empire • San Diego County • Ventura County • Temecula

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JAMES (JIM) OWENS,            )
                                   )
 5             Plaintiff,          )
                                   )
 6        vs.                      )  CASE NO. CV08-07116 DG
                                   )
 7   COUNTY OF LOS ANGELES,        )
     DEPUTY MARTINEZ, DEPUTY       )
 8   SHESHIRE, DOES 1-10, INC.,)
                                   )
 9             Defendants.         )
     _____)
10

11

12        DEPOSITION OF JAMES OWENS, taken by the defendant

13   COUNTY OF LOS ANGELES, ET AL, at 801 South Figueroa

14   Street, 15th Floor, Los Angeles, California, commencing

15   at 10:20 o'clock a.m., Thursday, February 25, 2010,

16   before JACQUELINE M. HARRIS, C.S.R. No. 7459, pursuant

17   to Notice.

18

19

20

21

22

23

24

25

                                                           2
```

1    APPEARANCES:

2

3    For the Plaintiff.  JAMES OWENS:

4        LAW OFFICES OF GARY S. CASSELMAN
         BY:   GARY S. CASSELMAN, ESQ.
5        3415 South Sepulveda Boulevard
         Suite 100
6        Los Angeles, California 90034

7    For the Defendants, COUNTY OF LOS ANGELES, ET AL.:

8        MANNING & MARDER, KASS, ELLROD, RAMIREZ
         BY:   TREAVOR GRIMM, ESQ.
9        801 South Figueroa Street
         15th Floor
10       Los Angeles, California 90017

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              3

1   we finish.  Okay?

2        A.    Sounds fair to me.

3        Q.    Is there any reason you can't -- we are

4   here to talk about an incident between you and the

5   three deputies.  I believe the date was December 16,

6   2007.

7             Does that sound right to you?

8        A.    15th, 2007.

9        Q.    15.  Okay.  And that was about 11:30 at

10  night?

11       A.    After that, 11:30, 1150.

12       Q.    Okay.  In there.  All right.  Okay.  So is

13  there any reason that you can't think back to that

14  incident and testify accurately?

15       A.    I'll do my best.

16       Q.    Okay.  What I mean is are you on any sort

17  of medication at all that might impair your memory?

18       A.    I was on medications, but now I'm just

19  taking pain killers.

20       Q.    Okay.  Have you taken any pain killers

21  today?

22       A.    No, not this morning.

23       Q.    Okay.  How about last night?

24       A.    Yes, I did last night.

25       Q.    What sort of pain killers did you take?

7

1      A.    I was putting the key into the lock on the
2  car door to unlock the door to open it to get in to
3  get the items.

4      Q.    Okay.  And you said two cars had their
5  lights blacked out.  They were off?

6      A.    Their headlights were off.  They had their
7  running lights on.

8      Q.    Okay.  And did you think anything of it at
9  the time you went out there?  I mean --

10     A.    No, sir.

11     Q.    Is it fairly common to see police officers
12  on that street at night?

13     A.    At night?

14     Q.    Yeah.

15     A.    Any time of the day.

16     Q.    Okay.  So they are frequent visitors
17  there?

18     A.    They patrol the neighborhood, you know,
19  fairly well.

20     Q.    Okay.  Would you say you see police cars
21  on a daily basis there?

22     A.    No.  Not on a daily basis.

23     Q.    Can you estimate about how often per week
24  or per month or whatever it might be?

25     A.    Maybe four times a week.

16

1    Q.    Okay.

2    A.    Maybe.

3    Q.    And are the police cars that you see

4  fairly regularly, are they what you would identify as

5  LA County Sheriff's cars?

6    A.    Yes, sir.

7    Q.    Had you ever had an occasion to -- you

8  personally -- call for service from your residence

9  there at 169th?

10   A.    No, sir.

11   Q.    Do you know any neighbors on your block?

12   A.    A couple of them and a couple of them have

13  moved.

14   Q.    Okay.  Since that date -- the date of the

15  incident?

16   A.    Yes.

17   Q.    Okay.  You'll understand if I say the

18  incident date as December 15, 2007.  Okay?

19   A.    Yes, sir.

20   Q.    Okay.  And do you know the neighbor that

21  lives at 4109 169th Street or did you know that

22  person on the date of the incident?

23   A.    No, sir.

24   Q.    Do you -- would you know the people that

25  live at that house by sight?

17

1    A.    No, sir.

2    Q.    After -- are you aware that the Sheriff's

3    Department received a call for service from that

4    address?

5    A.    Yes, sir.  I was informed of that.

6    Q.    Okay.  Have you heard the tape recording?

7    A.    Yes, sir.

8    Q.    Do you recognize the voice on that tape

9    recording?

10   A.    No, sir, I do not.

11   Q.    Do you recognize anything -- well,

12   withdraw.

13        Did you -- was there anything on that

14   recording that you heard that gave you some sort of

15   indication that you knew the people talking on that

16   tape?

17   A.    No, sir.

18   Q.    Do you have any reason to believe that

19   that tape is anything but genuine call for service?

20        MR. CASSELMAN:  Do you know?  I mean I

21   would object that it's calling for speculation, but

22   you can answer his question.

23   BY MR. GRIMM:

24   Q.    And just going forward, if I ask a

25   question like that, I don't want you to be guessing.

18

```
 1        A.    No, sir, I do not.

 2        Q.    Okay.  So when you walked outside and

 3   you -- how long was it after you -- after you first

 4   noticed the two patrol cars, how long was it between

 5   that moment and the time that you actually made

 6   contact with them in terms -- or they made contact

 7   with you?  By contact, I mean talking to you,

 8   engaging you, asking you things?

 9        A.    Maybe a little over a minute.

10        Q.    All right.  And what did you -- all right.

11   And so before you saw the police officers, and after

12   you came outside, did you notice any other people on

13   that street, your street that is?

14        A.    No, sir.

15        Q.    What did you do upon seeing the police

16   officers?

17        A.    They put a spot light in my face, told me

18   to drop what was in my hands, and put my hands up and

19   turn around.  And I followed their orders.

20        Q.    Did you see a third police car arrive that

21   evening?

22        A.    No, sir, I did not.

23        Q.    And the -- could you tell who was -- where

24   was -- withdraw.

25             Where did the command to drop what's in
```

29

```
 1    your hands and get on the ground come from?  Was it
 2    the first car or the second car?
 3         A.    I was never told to get on the ground.
 4         Q.    I'm sorry.  Drop what's in your hands and
 5    turn around?
 6         A.    Yes, sir.
 7         Q.    Okay.  Where did that command come from?
 8         A.    From the first vehicle.
 9         Q.    And where was it parked at the time that
10    you heard that command?  Or was it moving.
11         A.    If he was moving, he was going very slow.
12         Q.    Where did they -- withdraw.
13               Your car, where was it facing?  Which
14    direction?
15         A.    Her car was facing west.
16         Q.    So it was facing the correct direction?
17         A.    Yes, sir.
18         Q.    In other words, if you wanted to drive
19    off, you would already be heading west?
20         A.    Yes, sir.
21         Q.    Okay.  And so where did the first police
22    car park in relationship to your car or your wife's
23    car?
24         A.    He was probably a half of a car length
25    passed her driver door.
```

                                                    30

1        Q.    All right.  And parked in the middle of
2   the street?
3        A.    Yes, sir.
4        Q.    And how many deputies were in that car?
5              MR. CASSELMAN:  That he could tell?
6   BY MR. GRIMM:
7        Q.    Yeah.  Of course.
8        A.    One.
9        Q.    And that would be the driver of course?
10       A.    Yeah.
11       Q.    Okay.  And the second car, did it park
12   also?
13       A.    Yes, sir.
14       Q.    And where did it park?
15       A.    Right behind his.  Right behind the first
16   vehicle.
17       Q.    Okay.  In the middle of the street also?
18       A.    Yes, sir.
19       Q.    Would you be comfortable drawing a
20   diagram, just a rough diagram Ma'am?
21       A.    Sure.
22       Q.    The street, the house, how the cars are
23   parked.
24       A.    Sure.
25       Q.    I started doing it just like that, you

                                                    31

1   Q. Okay.  All right.  And so the first

2 deputy -- the first patrol car shines the light.

3 Could you tell it was a male right in the first car?

4   A. While he was conversing with me, yeah.  It

5 was a male.

6   Q. In the first car?

7   A. Yes, sir.

8   Q. Okay.  And how about the deputy in the

9 second car.  Was that male or female?

10   A. Male.

11   Q. Okay.  Was -- did a third car roll up at

12 some point?

13   A. No, sir.

14   Q. Okay.  Did you ever see a female deputy at

15 the scene?

16   A. No, sir.

17   Q. And -- okay.  So tell me what happened

18 after, you know, the deputy pulls up in the first

19 car.  The window is down I take it when he is talking

20 to you?

21   A. No.  He got out of the vehicle.

22   Q. How about when the spot light was shining

23 on you.  Was that a handheld flashlight or the car?

24   A. It was the car spot light.

25   Q. All right.  And did he wait until he was

                     35

```
 1    he said, "drop what's in your hands and turn around?

 2         A.    I complied with his orders.  And he came

 3    up behind me and told me to put my hands behind my

 4    head.  I did so.  He grabbed a hold of my hands and I

 5    asked him, "what's going on?"

 6              And he said, "don't worry about it.  It's

 7    police safety."

 8         Q.    And how would you describe his tone of

 9    voice to you?

10         A.    Rude.

11         Q.    All right.  Did he appear to be -- what's

12    the word -- demanding to you?

13         A.    Arrogant.

14         Q.    Okay.  You'd characterize it as arrogant?

15         A.    Arrogant, demanding, rude.

16         Q.    You inquired of him, "what's this about?"

17              He said, "don't worry.  It's police

18    business?"

19         A.    Police safety.

20         Q.    Police safety.  And were you leaning

21    against the car before he grabbed your hands?

22         A.    No, sir.

23         Q.    And were the hands -- were your hands the

24    first part of your body that the police officer

25    touched?
```

                                                        40

1        A.    Yes, sir.

2        Q.    Do you know what that police officer's

3   name is?

4        A.    No, I do not.  They keep changing the

5   story every time Mr. Casselman gets me something.

6        Q.    What do you mean by that?

7        A.    One time we get told it's Pruitt -- or

8   excuse me.  Cheshier and Martinez.  The next time we

9   hear about it, it's Pruitt and Cheshier.  Next time

10  we hear about it again, it's Martinez and Cheshier.

11  I don't know who is who by the last name.

12       Q.    All right.  After the first deputy --

13  we'll just refer to him as the first deputy in the

14  first car.

15       A.    Okay.

16       Q.    Meaning the first car, he was in front of

17  the second car.  Okay?

18       A.    Yes, sir.

19       Q.    All right.  What else -- What did he do

20  after he said "don't worry about it.  It's police

21  safety?"

22       A.    I yelled up to the house for Nancy.  And

23  he told me to shut the hell up.  I was causing a

24  disturbance.

25       Q.    How loud did you yell it, if you can

                                                    41

```
1   describe it?

2       A.    Kind of loud.  I mean not the top of my

3   lungs, but --

4       Q.    You wanted to get her attention?

5       A.    I wanted to get her attention.

6       Q.    And did -- was Nancy outside at the time

7   you yelled that or could you tell?

8       A.    No, she was sitting on the couch right

9   next to the front door.

10      Q.    Could you see her from where you were

11  standing?

12      A.    No, I can't see the couch because it's

13  just off to the left as you walk in the front door.

14      Q.    All right.  And what do you recall -- the

15  words you used exactly?

16      A.    "Nancy, get out here."

17      Q.    Okay.  And why did you want her out there?

18      A.    Because she works for -- with the

19  department of Redondo Beach Police.

20      Q.    What's her job there?

21      A.    She is information technology.  She takes

22  care of all the computers for the police department

23  investigators, etcetera.

24      Q.    Okay.  And so she works with police

25  officers?
```

42

1      Q.    Did -- was any other part of your body
2    injured that night --
3      A.    No, sir.
4      Q.    -- as a result of your contact with the
5    police officers?
6      A.    My wrists were a little sore, but nothing,
7    you know.  Just from him gripping and squeezing my
8    thumbs together.
9      Q.    That's what I was going to ask.  How did
10   he grab your hands?  In other words, were your hands
11   interlocked behind your head or were they just like
12   this?
13     A.    One on top of the other.
14     Q.    Okay.
15     A.    Just one on top of the other.
16     Q.    And how did he grab your hands?
17     A.    He grabbed my right arm and pulled it
18   behind my back.  And then he grabbed my left arm and
19   pulled it down behind my back and grabbed a hold of
20   my thumbs, which were together, and squeezed on them.
21     Q.    All right.
22           MR. CASSELMAN:  Indicating the palms
23   facing each other, for the record.
24   BY MR. GRIMM:
25     Q.    Right?  Is that right?  They were like

                                                    44

```
 1   this I mean?
 2         A.     My palms were out.
 3                MR. CASSELMAN:  Okay.  So the knuckles
 4   were touching.
 5                THE WITNESS:  The knuckles were touching.
 6                MR. CASSELMAN:  The palms not touching
 7   each other, the back of the hands were adjacent.
 8                THE WITNESS:  The palms of my hands were
 9   outward.
10   BY MR. GRIMM:
11         Q.     Got it.  And then he held on to the
12   thumbs?
13         A.     Both the thumbs, yes.  Very tightly.
14         Q.     Do you recall -- do you know if he was
15   holding your thumbs with his left hand or right hand?
16         A.     I do not remember.
17         Q.     Okay.  And -- okay.  So then what
18   happened?
19         A.     I told him -- I asked him again, "what's
20   going on?"
21                And he says, "police safety.  Don't worry
22   about it."  And I -- and he goes, "I am going to pat
23   you down."
24                And I said, "whatever you do, be careful
25   of my left knee.  I had a cortisone injection on it
```

                                                        45

1    Friday morning."

2         Q.    All right.  And what did he say in

3    response, if anything?

4         A.    At that time, he took his boot, swiped my

5    legs out, which is what injured my knee.

6         Q.    Okay.

7              MR. CASSELMAN:  I think he is asking you

8    if he said anything at that point.

9              THE WITNESS:  No, he didn't say anything

10   else.

11   BY MR. GRIMM:

12        Q.    So -- all right.  So if I understand the

13   sequence, tell me if I'm wrong.  You say, "what's

14   going on?"

15             He says, "don't worry about it.  Officer

16   safety."

17             MR. CASSELMAN:  Police safety.

18   BY MR. GRIMM:

19        Q.    Police safety.  All right.  He grabbed --

20   he took both your hands behind your back, grabbed

21   your thumbs, and then you said, "Nancy, get out

22   here?"

23        A.    I said that before he even got my hands

24   behind my back.

25        Q.    Okay.

46

1   Q. What did you say?

2   A. I screamed because it hurt.

3   Q. And did he say anything to you other than,

4 you know, begin to pat you down?

5    I mean in other words, you screamed.  He

6 begins patting you down, and then he smacked your

7 left knee about three times?

8   A. About three times.  And he says, "so

9 that's your left knee?"

10   Q. All right.  And then what did you say, if

11 anything.

12   A. I said, "yeah."

13   Q. And was there any further conversation?

14   A. No.

15   Q. All right.

16   A. He said -- after that, he says, "I am

17 going to put you in the car and I am going to run

18 your name."  And at that point, he pulled me

19 backwards, opened the car door, told me to, "get in."

20 I went to sit down.  He says, "get in."

21    I says, "I cannot bend my knee that far

22 back to get in the back of this vehicle."

23    So he put his hand on my chest, shoved me

24 through the back seat.  He says, "you are in now,

25 aren't you."

                  55

1     A.   No, sir.  He didn't.

2     Q.   Okay.  Just trying to get a -- he never

3 touched your chest with his hands until you actually

4 were sitting in the back of the car; correct?

5     A.   Correct.

6     Q.   Okay.  And so when you first sat down,

7 were your legs protruding out of the car?

8     A.   Yes, sir.

9     Q.   And when he pushed your chest, did you

10 then -- did your back then -- did you fall backwards

11 on to the -- laying down with your back on the seat?

12    A.   I didn't fall all the way backwards, no.

13    Q.   Okay.  But it caused you to scoot in

14 farther?

15    A.   Yes.

16    Q.   Scoot in farther into the back seat?

17    A.   Yes, sir.

18    Q.   Did he close the door then?

19    A.   Yes, sir.

20    Q.   And then what did he do?

21    A.   He promptly got into the front seat of his

22 vehicle and got on his computer.  And he then asked

23 me what my name was.

24    Q.   Did he ask you for your driver's license

25 at any time?

59

1       A.    No.

2       Q.    And did you give him your correct name?

3       A.    Yes, sir.

4       Q.    Did he ask you for your birth date?

5       A.    Yes, sir.

6       Q.    Okay.  Did he ask you for any further

7   information?

8       A.    Where my residence was.

9       Q.    And did you respond to him?

10      A.    Yes, sir.  I told him my name was Jim

11  Owens.  And he replied, "is it Jim or James on your

12  driver's license?"

13             And I told him, "I haven't looked at my

14  driver's license in over five years.  I don't know if

15  it says Jim or James on it."

16      Q.    Okay.  You never have to use your license

17  to -- in connection with using your credit card or

18  anything like that?

19      A.    I don't own a credit card.

20      Q.    Okay.

21      A.    My ex wife made sure of that.

22      Q.    Sorry.  Your ex wife?

23      A.    Made sure that.

24      Q.    Oh, that you couldn't get any credit?

25      A.    Exactly.

60

1      Q.    Yes?

2      A.    Yes.

3      Q.    All right.  And what happened after he

4  finished running you and you had no warrants?

5      A.    I set in the car for a little while.

6      Q.    About how long?

7      A.    A couple more minutes.

8      Q.    What's your total estimated time inside

9  that car?

10     A.    Probably 10 to 15 minutes.  Somewhere in

11  there.

12     Q.    Did it -- how long did you --

13     A.    It seemed like an eternity, but --

14     Q.    It seemed like an eternity?

15     A.    Yeah.

16     Q.    And how long did -- was he running your

17  information on a computer that was in the car?

18     A.    Yes.

19     Q.    How long do you think he was actually, you

20  know, working on that computer?

21     A.    I could not tell you how long he was

22  actually working on it.

23     Q.    Of the approximately 10 to 15 -- did you

24  say 10 to 15 --

25     A.    Somewhere in there.  I mean I could be off

                                                        63

1   by five minutes.  You know, just approximately.  I

2   was more in pain, thinking of what was going on, than

3   checking my watch.

4        Q.   Gotcha.  Was the deputy inside the patrol

5   car with you for that entire estimate you just gave?

6        A.   Yes, sir.

7        Q.   Was there any further conversation with

8   that deputy other than what you've told us already?

9        A.   No, sir.

10       Q.   What did the deputy do after he said that

11   you have no warrants?

12       A.   The other deputy that was talking to Nancy

13   came over to his car and opened up the back door.

14   And him and Nancy, as well, helped me out of the back

15   seat.

16       Q.   Did you hear -- before that happened,

17   before the other deputy walked over to where you were

18   sitting, did you hear any conversation between the

19   two deputies?

20       A.   They weren't talking.  One was coming down

21   the driveway towards the street and the other one was

22   still in his vehicle.

23       Q.   Okay.  And so what you are doing now, you

24   are describing for me what they were doing.  I'm

25   merely asking at any time up to the point where the

64

1    she was talking to the person she was talking to at

2    the Sheriff's Department.

3         Q.    Okay.  Before she called the Sheriff's

4    Department the next day, did she tell you the name

5    that she thought she saw on the second deputy's

6    uniform?

7         A.    Huh-uh.

8         Q.    No?

9         A.    No, sir.

10         Q.    Okay.  And I'm sorry.  Did you tell me

11    your estimate of the age of the second deputy?  I

12    can't remember.

13         A.    I did not tell you that and I do not know.

14    Approximately 30 to 40 years of age.

15         Q.    And you said --

16         A.    I'm guessing.

17         Q.    Okay.  The first one you said you thought

18    he was in his 30's?

19         A.    Approximately in his 30's.

20         Q.    All right.  Did you have any conversation

21    at all with the second deputy?

22         A.    Second deputy helped me out of the vehicle

23    along with Nancy.  And he says, "have a good night."

24         Q.    All right.  Did you have any further

25    conversation that we haven't talked about?

68

1          A.    No, sir.

2          Q.    Did you ever ask any further questions?

3     You know, at the outset, you said "what's this about"

4     or something to that effect to the first deputy.

5               But did you ever ask any questions of

6     either of the deputies later?

7          A.    Myself personally?

8          Q.    Yes.

9          A.    No.

10         Q.    And I take it you are making a distinction

11    and that you heard that Nancy did ask some questions?

12         A.    He said something later that she asked a

13    couple questions, but the deputy that she was

14    speaking to in the driveway kind of changed the

15    subject for her and asked her who she was.  What she

16    had done for a living.  Where does she work.  And

17    going on about that she responded with, "I work for

18    or with the police department.  I do all their

19    computers in their cars, etcetera.  You know,

20    detectives, etcetera."

21              And he stated something to the fact of --

22    started talking about how crappy their computers were

23    in the Sheriff's vehicles.  So as far as him

24    explaining anything directly to her, I don't believe

25    he did.

                                                      69

1    are him, Ms. English, and the two deputies.

2           MR. CASSELMAN:   Right.

3    BY MR. GRIMM:

4        Q.    Right?

5        A.    That's correct.

6        Q.    All right.  So did you -- you eventually

7    filed a complaint; right?

8        A.    Yes.

9        Q.    A citizen's complaint?

10       A.    Uh-huh.  Yes, sir.

11       Q.    And what was the reason for doing that?

12       A.    I didn't feel I was treated professionally

13   with good conduct and I got injured over it.  And I

14   wasn't explained to why they were even questioning

15   me.

16       Q.    All right.  And then -- do I have that

17   Complaint, Gary?

18          MR. CASSELMAN:   I don't know what you

19   have.

20   BY MR. GRIMM:

21       Q.    Was the -- was the Complaint made in

22   person at the station or over the phone?

23       A.    Over the phone, sir.

24       Q.    And you made the Complaint?

25       A.    No.  My wife did.  My girlfriend at the

                                                      71

```
 1    time, my wife now, was the one that made the phone

 2    call.

 3         Q.    Is that the next day?

 4         A.    That was the next morning, yes.

 5         Q.    Okay.  Is that the only call that you are

 6    aware of?

 7         A.    That I was aware of that she called.

 8         Q.    Yes.

 9         A.    That's the first call that she called and

10    made a phone call, yes.

11         Q.    And the only one?

12         A.    That she called?

13         Q.    Yes.

14         A.    I'm assuming that's the only one she

15    called, yes.

16         Q.    Did you make any phone calls?

17         A.    She received a phone call prior from a

18    detective to talk to me.  I was working.  And I

19    returned his phone call a few days later.

20         Q.    Do you recall the name of the person?

21         A.    I don't recall the detective's name.

22         Q.    Did you speak with him?

23         A.    Yes, sir, I did.

24         Q.    Was it a male?

25         A.    Yes, sir, it was.
```

72

1    a male and a female."

2        Q.    How long after the incident was it that

3    you actually spoke with this person?

4        A.    Within a week.

5        Q.    And did he tell you that after the -- did

6    he tell you he was calling to investigate what

7    happened?

8        A.    Yes, sir, he did.

9        Q.    Did he tell you he would get back to you

10   and let you know the results of the investigation?

11       A.    I don't recall him saying that.

12       Q.    Did you tell him that -- well, you said

13   Nancy called about the Complaint initially.  But did

14   you tell the detective that called you that you spoke

15   with, did you say, "I am making a complaint against

16   the one deputy?"

17       A.    I didn't know the deputy's name that -- at

18   the time that actually put his hands on me.

19       Q.    Do you have any complaints about the

20   actions of the second deputy?  I'm not asking you for

21   any official legal conclusion, I just want to know do

22   you personally feel that the second deputy did

23   anything wrong in your mind that would be wrong?

24            MR. CASSELMAN:  Well --

25            THE WITNESS:  I don't really understand

                                                        74

1            MR. CASSELMAN:  You are not a lawyer.

2   BY MR. GRIMM:

3        Q.    That's all I'm asking.

4        A.    I don't know that he did anything that

5   wasn't by the book when he was talking to Nancy.

6        Q.    All right.  How about when he came over

7   and assisted you from the car?

8        A.    When he opened the door on the car to let

9   me out, he says, "have a good night."

10        Q.    Did he touch you at all?

11        A.    I don't believe he did.

12        Q.    And what's your total estimate from the

13   time the first deputy first touched you until the

14   time when the -- withdraw.

15            MR. CASSELMAN:  Second deputy?

16   BY MR. GRIMM:

17        Q.    Did both deputies leave at the same time?

18        A.    The first deputy never got out of his

19   vehicle.  The second deputy got into his vehicle.

20   They continued to drive east on 169th Street.  They

21   went down to the end of the cul de sac area, which

22   it's a dead end street, but it wraps around.

23        Q.    It has a cul de sac on it?

24        A.    Not really a cul de sac, it wraps around

25   from one street.  It goes down and it curves and

76

1    the other deputy?

2              MR. CASSELMAN:   That's vague and

3    ambiguous, but he can tell you what he knows.   That's

4    about it.

5    BY MR. GRIMM:

6         Q.   I want to fix it.   I don't want there to

7    be any -- I don't want it to be vague or ambiguous.

8              I am just saying can you say with

9    certainty that Deputy Martinez, the female police

10   deputy, did not respond?

11        A.   I never saw a female deputy that night.

12        Q.   Okay.   And so are you telling me that you

13   can't say for sure that she didn't respond or are you

14   saying she did not respond?

15             MR. CASSELMAN:   I think the question is

16   argumentative.   He says he didn't see her.   That's

17   all he can say.

18   BY MR. GRIMM:

19        Q.   Is that right?   Is that accurate?

20        A.   I did not see a third deputy that night.

21        Q.   Okay.   All right.   So then --

22             MR. CASSELMAN:   Can we go off the record

23   one second?

24             (Discussion held off the record.)

25   /  /  /  /  /

                                                      84

1   was doing with the second deputy or if he was looking

2   straight ahead the whole time and wasn't observing

3   what was going on behind him, he can tell me that.

4   Right?  I mean he can tell me that he wasn't looking

5   around to see if somebody else might have arrived.

6       Q.   I don't know -- I am not following you.  I

7   am not -- he doesn't have to agree that everything

8   she wrote here was what she observed.  I'm just

9   trying to find out if you were in a position and/or

10  conscious enough and looking around enough to say

11  that there was no other deputy at any time on that

12  street.  That's it.

13      A.   I did not see any other deputies arrive

14  that night except for the two that arrived in the

15  vehicles that were males.  I did not see any car come

16  up.  I did not hear another vehicle come up.  I did

17  not see a female deputy.

18      Q.   Okay.  And I appreciate that.  Can you

19  tell me for sure that had another deputy responded,

20  you would have seen it?

21          MR. CASSELMAN:  You mean arrived at the

22  location?

23  BY MR. GRIMM:

24      Q.   Yeah.  On the street.  Maybe parked across

25  the street?

1    the names.  I understand there's some confusion.  But

2    he says that he when he arrived, he saw a male adult

3    white leaning into a parked car.

4         Were you leaning into a parked car at the

5    time you first noticed the deputies?

6         A.   Not the first time I noticed them.

7         Q.   Okay.

8         A.   I noticed them when they were down the

9    street and had just their driving lights --

10        MR. CASSELMAN:  Just answer the question.

11   BY MR. GRIMM:

12        Q.   Okay.  And I appreciate that.

13        Did you actually open the car and lean

14   into it after you saw -- after you first saw the

15   deputies?

16        A.   Yes.

17        Q.   Okay.

18        A.   I unlocked the door, opened it, and got

19   inside, and got the address book.

20        Q.   Did you have the address book in your hand

21   at the time the first deputy told you to drop what

22   was in your hands?

23        A.   Yes, I did.

24        Q.   What else did you have in your hands, if

25   anything?

91

1          A.     The pen that was attached to the address
2     book.
3          Q.     What about your -- the car key?
4          A.     The car key was still in the door.
5          Q.     Okay.  So that -- you did not have that in
6     your hands?
7          A.     No.  I left the car key in the door.
8          Q.     Okay.  And this Deputy Cheshier says he
9     saw a deputy doing a cursory search or a pat down
10    search essentially is what that means.
11              You were patted down; correct?
12         A.     Yes.  One of the deputies did pat me down.
13         Q.     Were you aware -- or on the date of the
14    incident, was this area of Lawndale a gang area?
15              MR. CASSELMAN:  I think you misspoke.  You
16    said the Cheshier says he saw a deputy doing the pat
17    down.  I believe that Cheshier is the one who had all
18    the physical contact with --
19              MR. GRIMM:  You are right.
20              MR. CASSELMAN:  -- my client.
21              MR. GRIMM:  You are right. You are right.
22    I apologize for that.
23         Q.     On the day of the incident, was this area
24    of Lawndale a gang area?  Would you have considered
25    it a gang area?

                                          92

```
 1        A.    I would consider this part of Lawndale a
 2   gang area.
 3        Q.    Yeah.   Are there gang members that you are
 4   aware of, gang crimes, you know, just from living
 5   there?  Are you aware of that?
 6        A.    I have never seen any gang crimes on my
 7   street.
 8        Q.    Okay.
 9        A.    I mean I'm sure in that area, there are.
10   I mean there's -- I've seen taggings on the side of
11   the freeway wall.  But as far as on my street, and I
12   have been there a while, I have never experienced
13   anybody doing any harm to anybody else's vehicles or
14   houses or persons.
15        Q.    How long did you live there as of the date
16   of the incident?
17        A.    I'm sorry.
18        Q.    How long before the incident happened did
19   you move in there?  How long had you been living
20   there?
21        A.    Since 1998.
22        Q.    Okay.  And did you have fairly regular
23   hours on your job?  Were you working at the
24   orthopedic clinic from the time you moved into that
25   house --
```

93