L. TREVOR GRIMM, ESQ., SBN 186801
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTOR LLP**
15th Floor at 801 Tower
801 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 624-6900
Email: ltg@mmker.com

Attorneys for Defendants
COUNTY OF LOS ANGELES, CHRISTINA
MARTINEZ , CASEY CHESHIER and ADAM
PRUITT

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES (JIM) OWENS,<br><br>                              Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES,<br>DEPUTY MARTINEZ, DEPUTY<br>SHESHIRE, DOES 1-10, inclusive,<br><br>                              Defendants.<br>_____ | Case No.: CV08-07116 DMG (Ex)<br>[*Assigned to Judge Dolly M. Gee;*<br>*Courtroom 7*]<br><br>**NOTICE OF MOTION AND**<br>**MOTION IN LIMINE NO. 2 TO**<br>**EXCLUDE EVIDENCE THAT THE**<br>**PLAINTIFF SUFFERED AN**<br>**INJURY TO HIS KNEE IN THIS**<br>**INCIDENT; DECLARATION OF**<br>**L. TREVOR GRIMM**<br><br>**[*(Proposed) Order Filed Concurrently*<br>*Herewith*]**<br><br>Trial Date:   February 28, 2012<br>Time:           8:30 a.m.<br><br>Final PTC:   January 30, 2012<br>Time:           1:30 p.m. |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

NOTICE IS HEREBY GIVEN that on January 30, 2012 at 1:30 p.m. in Court-room 7 of the United States District Court for the Central District of California, located at 312 North Spring Street, Los Angeles, CA 90012, defendant CASEY CHESHIER will and hereby does move this Court for an order excluding evidence of any injury

to the plaintiff's knee allegedly suffered by the plaintiff as a result of the incident at issue in this lawsuit.  The grounds for this Motion are *Federal Rules of Evidence*, Rules 401 - 403.

This Motion is based upon this Notice of Motion, the attached Memorandum of Points and Authorities and declaration of L. Trevor Grimm, the pleadings and papers on file with the Court, and upon such argument and evidence, both oral and documentary, as the Court may entertain at the hearing of this Motion.

Counsel for the defendant has emailed and mailed correspondence to plaintiff's counsel outlining the defendant's proposed motions in limine and the bases therefore, and defense counsel has spoken on more than one occasion with plaintiff's counsel, Gary Casselman, in an attempt to obviate the necessity of bringing this motion. However, the parties were unable to agree upon a solution short of motion practice.  See Declaration of L. Trevor Grimm, paragraph 4.

Dated: January 9, 2012          **MANNING & KASS**
                                **ELLROD, RAMIREZ, TRESTOR LLP**

                        By:   /s/ ***L. Trevor Grimm***
                             L. TREVOR GRIMM
                             Attorneys for Defendants
                             COUNTY OF LOS ANGELES, CASEY
                             CHESHIER, ADAM PRUITT and
                             CHRISTINA MARTINEZ

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

At the first trial of this matter, two claims were pursued by the plaintiff: that he was the subject of an illegal stop and search and that he was subjected to excessive force during the course of that detention.   The jury found for the defendant on both counts.  This Court, in its order of July 5, 2011 (Docket No. 136), granted the plaintiff's motion for judgment as a matter of law as to the illegal stop and search claim and denied the plaintiff's motion for new trial as to the excessive force claim, thereby affirming the jury's verdict on the excessive force claim.

This Court, in its order of September 7, 2011 (Docket No. 145, at page 3), held that "a new trial is warranted on damages" on the plaintiff's claim that he was "injured during the detention and search."   As this Court explained, quoting from *Cortez v. McCauley,* 478 F.3d 1108, 1127 (10th Cir. 2007) (*en banc*), "[i]f the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest."

However, given the findings made by the jury in the prior trial, the plaintiff cannot claim that his knee was injured during the detention and search by Deputy Cheshier, and accordingly he should not be permitted to offer any evidence at this new trial of any such knee injury.

## 1.    THE PARTIES' TESTIMONY AT THE FIRST TRIAL

At the first trial, the plaintiff testified that after he was ordered to put his hands behind his back by Deputy Cheshier, the deputy grabbed the plaintiff's thumbs and kicked the plaintiff's legs apart.  RT 10/6/10, pages 71-74.

"Q. Can you tell the jury, to the best of your recollection, what your body

did when he kicked it, kicked at your foot or ankle?

G:\docsdata\ltg\Cases\Owens\New Trial Docs\MIL #2.Knee.wpd

A. When my heel went outward, and so the lower part of my leg completely twisted, and I lost my balance because my foot started to slip away, and I felt just extreme pain at that moment, and I lost my balance. But with deputy holding my hands and my other leg, I've got to control my balance and stand back up.

Q. Where did you feel the pain?

A. In my knee, on the inside.

Q. Is that a place where you had felt that kind of pain or any kind of pain before?

A. No.

Q. Was that similar to the osteochondroma problem you had above your knee?

A. That was extremely worse than any type of pain I've ever had in my knee."

RT 10/6/10, page 75, lines 5-22.

The plaintiff offered at the first trial the expert testimony of an orthopedic surgeon, Dr. Robert B. Fenton.  Dr. Fenton testified that the plaintiff had told him that "the officer had him spread his legs, and that he had been kicked or pushed, his foot has been pushed out to the side while he was standing on the leg, and that in the process of doing this, he created discomfort and pain on the inner-side of his knee."  RT 10/7/10, page 197, lines 18-22.

"His feet were spread apart, like this (demonstrating), and as the officer apparently applied some force to the inner-side of his heel and foot or ankle or whatever you'd like to describe, his heel rotated out to the side. And I'm not sure I can demonstrate this, but it's turning, the heel turned in what would be a rotational movement like this."

RT 10/7/10, page 198, lines 14-20.

///

4

Dr. Fenton then explained at length how this rotational movement, in combination with the plaintiff's position at the time of the kick, caused an injury to the plaintiff's medial meniscus.  RT 10/7/10, page 198, line 25 - page 200, line 15.

"Q. So, based on everything you're told, everything that you've seen, do you relate -- and the traumatic nature at the time of this injury, do you relate it to the conduct of what Mr. Owens told you?

A. Once again, sir, it was, in my mind, consistent with the mechanism of injury that I was told, and the findings are all consistent."

RT 10/7/10, page 243, lines 3-9.

## 2.     THERE IS NO REMAINING FACTUAL BASIS ON WHICH THE PLAINTIFF CAN CLAIM THAT HIS KNEE WAS INJURED IN THE COURSE OF HIS DETENTION BY DEPUTY CHESHIER

In the first trial, the plaintiff and his medical expert Dr. Fenton explicitly testified that the injury the plaintiff claimed to have suffered to his knee in the course of his detention by Deputy Cheshier was directly related to the deputy having kicked the plaintiff during the course of the incident.  However, as is discussed in more detail in the defendant's MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE THAT THE PLAINTIFF WAS KICKED BY DEPUTY CHESHIER, the rejection by the jury in the first trial of the plaintiff's excessive force claim necessarily means that the jury concluded that the deputy did ***not*** kick the plaintiff during this incident.

But if Deputy Cheshier did not kick the plaintiff during this incident, then any injury that the plaintiff might have suffered to his knee during this incident could not have been caused by the non-existent kick.  The plaintiff's medical expert testified the injury allegedly suffered was consistent "the conduct of what Mr. Owens told [him]".  But the only "conduct" by the deputy that Dr. Fenton indicated had been related to him by the plaintiff was the kick, and Dr. Fenton testified at length how that kick – and that kick alone – could have caused the injury which the plaintiff was exhibiting.  Dr. Fenton

did not indicate that the plaintiff had suggested that any other "conduct" by Deputy Cheshier caused or contributed to that injury, nor did Dr. Fenton suggest that anything other than the alleged kick in any way caused or contributed to the injury to the plaintiff's knee.

But since the jury at the first trial determined that the kick did not actually occur, and if the non-existent kick was the only mechanism of injury to the plaintiff's knee suggested by either the plaintiff or his medical expert at the prior trial, then the only possibly conclusion is that the plaintiff's knee was **not** injured in this incident.

Federal Rules of Evidence Rule 402 provides that "[i]rrelevant evidence is not admissible." Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Evidence regarding the alleged injury to the plaintiff's knee obviously cannot have "any tendency to make a fact more or less probable" in this re-trial because, as discussed above, the verdict at the prior trial, plus the testimony at that trial of the plaintiff and his medical expert, conclusively establish that the plaintiff did not suffer an injury to his knee during this incident. Therefore, this Court must exclude any evidence the plaintiff or his witnesses might attempt to introduce relating to this alleged injury.

The only way around this would be for the plaintiff and his medical expert to testify in this new trial that there was some other mechanism of injury that caused the damage to the plaintiff's knee during the incident. But that would require the plaintiff and his expert to repudiate their prior testimony, given at the first trial under oath. Federal Rules of Evidence Rule 403 permits a court to exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Allowing the plaintiff and his medical expert to change their testimony to avoid the consequences of the jury's finding that the kick never occurred – the kick that the

plaintiff and his medical expert indicated was the sole cause of the plaintiff's knee injury – would be grossly unfair and highly prejudicial to the defendant. The defendant not only prepared this case based on the plaintiff's claim that the mechanism of injury to his knee was the alleged kick by Deputy Cheshier, he took that case to trial and convinced the jury that the alleged kick never took place. The defendant is in no way prepared to defend against a newly-created claim that an entirely different mechanism of injury caused the supposed damage to the plaintiff's knee. Nor should the defendant be required to do so.

## 3.      RELIEF REQUESTED

For the reasons set forth herein, the defendant respectfully requests the court to order plaintiff, his counsel, and his witnesses not to make any reference to, mention of, or attempt to introduce by any means, evidence of any injury to the plaintiff's knee allegedly suffered by the plaintiff as a result of the incident at issue in this lawsuit.

Dated: January 9, 2012             Respectfully submitted,

**MANNING & KASS
ELLROD, RAMIREZ, TRESTOR LLP**

By:   /s/ ***L. Trevor Grimm***
L. TREVOR GRIMM
Attorneys for Defendants
COUNTY OF LOS ANGELES, CASEY
CHESHIER, ADAM PRUITT and
CHRISTINA MARTINEZ

7

# DECLARATION OF L. TREVOR GRIMM

I, L. Trevor Grimm, declare as follows:

1.      I am an attorney at law, admitted to practice before all courts of the State of California, the United States District Court for the Central District of California, and the Ninth Circuit Court of Appeals. I am a partner at Manning & Kass, Ellrod, Ramirez, Trestor  LLP, attorneys of record for defendant CASEY CHESHIER herein. I have personal knowledge as to the truth of the following facts, except those set forth on information and belief, and as to those facts I believe them to be true. If called as a witness, I could and would competently testify to the following.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the following pages of the reporter's transcript the proceedings that took place on October 6, 2010 during the first trial held in this matter:  71-75.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the following pages of the reporter's transcript the proceedings that took place on October 7, 2010 during the first trial held in this matter: 197-200, 243.

4.      Since the Court's order of September 7, 2011, I have communicated extensively with plaintiff's counsel, Mr. Casselman, both telephonically and via email correspondence, about the defendant's proposed motions in limine, including this one, and the bases therefor.  The communications ranged from months ago through this week.  The reason for those communications was, among other things, to attempt to obviate the necessity of bringing this motion.  However, the parties were unable to agree upon a solution short of motion practice.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 9th day of January, 2012, at Los Angeles, California.

/s/ **L. Trevor Grimm**
L. TREVOR GRIMM

G:\docsdata\ltg\Cases\Owens\New Trial Docs\MIL #2.Knee.wpd

**E X H I B I T   1**

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                         ---

 4          HONORABLE DOLLY M. GEE, JUDGE PRESIDING

 5                         ---

 6

 7

 8
    JAMES JIM OWENS,                    )
 9                                      )
                                        )
10                                      )
                                        )
11                 Plaintiff,          )
                                        )No. 08-7116DMG
12          VS                          )
                                        )
13  COUNTY OF LOS ANGELES, et al,      )
                                        )
14                 Defendants.         )
15  _____)

16

17          Reporter's Transcript of Proceedings
                  JURY TRIAL - DAY TWO
18                Los Angeles, California
              WEDNESDAY, OCTOBER, 6, 2010
19

20

21

22

23          Anne Kielwasser, CSR, RPR
              Federal Official Court Reporter
24          312 North Spring Street, Room 432
              Los Angeles, California 90012
25              Phone: (213) 894-2969
                anne.kielasser@gmail.com
```

1   A.    Just the glimpse out of the corner of my eye, that's

2   all.

3   Q.    And did he ask you any questions before he gave you

4   orders to put your hands behind your back?

5   A.    No, he didn't ask me any questions.

6   Q.    Did you feel that you were free to leave at that time?

7   A.    Not at all.

8   Q.    And so, after he made you put your hands behind your

9   back, what happened next?

10  A.    I asked him what was going on.

11  Q.    Did he answer you?

12  A.    He told me:  Police safety.  Don't worry about it.

13  Q.    Did that answer your question?

14  A.    Of course not.  I asked him again.

15  Q.    Then what?

16  A.    He gave me the same answer:  Police safety.

17  Q.    What was his tone or attitude?

18  A.    He was arrogant, he was rude and he was demanding.

19  Q.    How did you feel about this at that time?

20  A.    I was curious why I was even being stopped.  I didn't

21  know what was going on.  I didn't think I should be treated

22  rudely.

23  Q.    Then what happened?

24  A.    He kicked my legs out.

25  Q.    Okay.  And how are -- well, let's back up.  Did he

1    physically contact you before he kicked your legs?

2    A.    Yes, he grabbed my hands which were behind my back.

3    Q.    What part of your hands did he grab?

4    A.    My thumbs.  I had my -- my, the back of my hands

5    together, my palms outward behind my back.

6    Q.    Did he tell you to do it that way?

7    A.    No.  He just said:  Put your hands behind your back.

8    And then he grabbed my thumbs.

9    Q.    And do you know if he did it with one or two hands?

10   A.    I believe it was with one.

11   Q.    Did he grab each thumb separately?

12   A.    No.

13   Q.    So, he squished your thumbs together to hold you?

14   A.    Yes, he did.

15   Q.    And did you feel you were free to leave then?

16   A.    Of course not.

17   Q.    Did he tell you were under arrest?

18   A.    No, he didn't tell me nothing like that.

19   Q.    Did he ask you your name?

20   A.    No, he did not.

21   Q.    Did he ask you where you live?

22   A.    No, he did not.

23   Q.    Did he ask you whose car that was?

24   A.    No, he did not.

25   Q.    Did he ask you what you were doing?

```
 1    A.    No, he did not.

 2    Q.    Did he ask you any questions at that point?

 3    A.    No, he did not.  All he gave was statements.

 4    Q.    Anything besides what you've already told us?

 5    A.    Yes.

 6    Q.    What else did he say at that point?

 7    A.    Well, at that point I had yelled for Nancy, my fiancee

 8    at the time.

 9    Q.    So, when he grabbed your thumbs, and you were

10    restrained by him, is that when you called for her?

11    A.    As soon as he kicked my leg out, I called.  I screamed

12    out for her.

13    Q.    What happened to your body when he kicked -- by the

14    way, let's be more specific.  What part, which leg did he

15    kick?

16    A.    The inside of my left foot and ankle.

17    Q.    Had you told them anything up to that point about,

18    anything about your body?

19    A.    I told him be careful with my knee, if you're going to

20    do a search.  I just had a Cortizone injection that Friday

21    morning.

22    Q.    What did he say, if anything?

23    A.    He didn't say nothing to that effect.

24    Q.    Did he tell you he wanted you to spread your legs?

25    A.    No, he didn't.
```

```
 1   Q.    Did he, like, pull on the material of your clothing,
 2   your sweatpants to move your leg out?
 3   A.    No, he didn't.
 4   Q.    Was there any warning that he was going to kick your
 5   leg?
 6   A.    No warning whatsoever.
 7   Q.    What part of your leg or foot or ankle did he kick?
 8   A.    The inside of it.
 9   Q.    Now, was this a hard enough kick to cause a bruising
10   or just to move out your leg?
11   A.    Just to move my foot out.
12   Q.    And then was he still holding on to your thumbs, as
13   you said, tightly?
14   A.    Yes, he was.
15   Q.    And then was he making you stand straight up, or were
16   you being leaned one way or the other, back or forward?
17              MR. GRIMM:  Objection.  Leading.
18              THE COURT:  Sustained.
19   BY MR. CASSELMAN:
20   Q.    Were you leaning in any direction?
21   A.    I -- sorry.  (Witness weeps.)  I lost my balance.
22   (Witness weeps.)
23              MR. CASSELMAN:  Excuse me, Your Honor.  Mr. Grimm
24   seems to think this is funny, and he's making --
25              THE COURT:  All right, please do not --
```

```
 1              MR. GRIMM:  I'm not intentionally doing anything.

 2              THE COURT:  Do not exhibit any facial expressions

 3    during the testimony, please.

 4    BY MR. CASSELMAN:

 5    Q.    Can you tell the jury, to the best of your

 6    recollection, what your body did when he kicked it, kicked at

 7    your foot or ankle?

 8    A.    When my heel went outward, and so the lower part of my

 9    leg completely twisted, and I lost my balance because my foot

10    started to slip away, and I felt just extreme pain at that

11    moment, and I lost my balance.  But with deputy holding my

12    hands and my other leg, I've got to control my balance and

13    stand back up.

14    Q.    Where did you feel the pain?

15    A.    In my knee, on the inside.

16    Q.    Is that a place where you had felt that kind of pain

17    or any kind of pain before?

18    A.    No.

19    Q.    Was that similar to the osteochondroma problem you had

20    above your knee?

21    A.    That was extremely worse than any type of pain I've

22    ever had in my knee.

23    Q.    Did you make any kind of a sound or did you just

24    silently scream, so to speak?

25    A.    I yelled Nancy's name.
```

**E X H I B I T   2**

1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                            ---

4            HONORABLE DOLLY M. GEE, JUDGE PRESIDING

5                            ---

6

7

8

    JAMES JIM OWENS,                    )
9                                       )
                                        )
10                                      )
                                        )
11                 Plaintiff,           )
                                        )No. 08-7116DMG
12          VS                          )
                                        )
13   COUNTY OF LOS ANGELES, et al,      )
                                        )
14                                      )
                   Defendants.          )
15   _____)

16

17            Reporter's Transcript of Proceedings
                  JURY TRIAL - DAY THREE
18               Los Angeles, California
                THURSDAY, OCTOBER 7, 2010
19

20

21

22

23            Anne Kielwasser, CSR, RPR
              Federal Official Court Reporter
24          312 North Spring Street, Room 432
              Los Angeles, California 90012
25               Phone: (213) 894-2969
               anne.kielasser@gmail.com

1    history?

2    A.    Yes.

3    Q.    In other words, did he tell you how he got the problem

4    that he came to you for help about?

5    A.    Well, that's when we discussed an incident that when

6    he had been going out to his wife's car, I believe, and

7    apparently there had been some type of a problem that someone

8    had called the sheriff's department to come out onto the

9    street, and he was outside.  And I don't know the particulars

10   as to how the officer and Mr. Owens got together, but

11   apparently he was at least a suspect for the moment, as to

12   the source of the potential problem from which the phone call

13   came in.

14           And he was describing to us having his -- I

15   think he was leaning in the window of his wife's car, and I'm

16   not sure exactly how that, how he subsequently stood up and

17   was in the presence of the officer; but at some point in our

18   discussion he told me that the officer had him spread his

19   legs, and that he had been kicked or pushed, his foot has

20   been pushed out to the side while he was standing on the leg,

21   and that in the process of doing this, he created discomfort

22   and pain on the inner-side of his knee.

23   Q.    Did he show you what had been done in terms of the

24   movements that he made, or did he describe it in words?

25   A.    No, we actually went over it.

1    Q.    Could you demonstrate for the jury what you believe to

2    be the injury causing movement based on the information that

3    you've received to date, not just as of that date.

4    A.    I'll speak up because I can't hold the microphone at

5    the same time.

6              THE COURT:  Mr. Grimm, are you able to see?

7              MR. GRIMM:  I'll stand.

8              THE WITNESS:  I believe at first he described the

9    officer asking him to put his hands behind his head; and then

10   subsequently, the officer had him bring his hands or helped

11   to get his hands behind his back, and then was holding his

12   thumbs, and I'll turn around, so that this is the way I

13   understood what we were talking about.

14              His feet were spread apart, like this

15   (demonstrating), and as the officer apparently applied some

16   force to the inner-side of his heel and foot or ankle or

17   whatever you'd like to describe, his heel rotated out to the

18   side.  And I'm not sure I can demonstrate this, but it's

19   turning, the heel turned in what would be a rotational

20   movement like this.

21              MR. CASSELMAN:  Clockwise for the record, Your

22   Honor.

23              THE WITNESS:  That would be the heel.

24              MR. CASSELMAN:  Yes.

25              THE WITNESS:  In the process of that happening, he

1    began to fall forward, and he fell off to the right side,

2    which would put a stress on the inner-side of the knee, and

3    he would have been bearing weight on the leg at the same

4    time.  So, it would have been a rotational force and a fall

5    inward like this, and he could not control his balance

6    because his hands were sequestered.

7                    Mechanically, conceptually, what does that

8    mean from the standpoint of what may have happened, and I'm

9    going to briefly give you all an anatomy lesson, if I may.

10   You have to stick a strap along the inside of the knee,

11   called medial/lateral ligament.  Dr. Wagner talked about it.

12   It's a thick piece of gristle, and it's attached to the end

13   of the thigh called the femur, and the upper end of the leg

14   called the tibia.

15                    Now, if you can imagine the knee flexing in

16   this direction normally, you don't want your knee to flex the

17   opposite, side to side, nobody wants that.  But if he was

18   compressing the knee at the time, his lower leg was rotating

19   and at the same time was angulating, you can imagine that

20   this C shaped structure, which is more normally demonstrated

21   on the outer half of the joint, could become pinned between

22   two surfaces, the end of the thigh bone and the upper end of

23   the lower leg, and it could be caught and ripped.

24                    And the consistency of this material is like

25   your ear.  It's the same material that your ear is made out

1  of.  So, it can rip, and we call that medial meniscal tear,

2  because it's the inner side, is called the medial side of the

3  leg.

4              At the same time, the strap called the

5  collateral ligament, would be put under tension.  And if you

6  look at it, and what is diagrammatically shown here, it's

7  made up of thousands of thousands of super thin bristle,

8  called collagen.  And so, you could tear some of these fibers

9  without tearing the entire structure, and that was the

10  differentiation that Dr. Wagner made between a tear and a

11  rupture.

12              If you can imagine a rupture, you can either

13  tear it here, or you can tear it off of the bone at either

14  end.  In this particular case, it was more of a stretching

15  type of injury and had microscopic tear.

16              Now, to get back to your question I believe

17  you asked me a moment ago, when he came in, on my

18  examination, as compared to three days earlier, when he had

19  tenderness up here.

20              MR. CASSELMAN:  Indicating by the osteochondroma,

21  for the record.

22              THE WITNESS:  I'm sorry.  He now is describing

23  tenderness and pain along the collateral ligament and along

24  the gap between the two bones which is called the medial

25  joint line.  It's a little indentation.  You can feel it on

```
 1   about a bicycle or rollerblading or something?
 2   A.      No.
 3   Q.      So, based on everything you're told, everything that
 4   you've seen, do you relate -- and the traumatic nature at the
 5   time of this injury, do you relate it to the conduct of what
 6   Mr. Owens told you?
 7   A.      Once again, sir, it was, in my mind, consistent with
 8   the mechanism of injury that I was told, and the findings are
 9   all consistent.
10   Q.      Fair enough.
11                MR. CASSELMAN:  Nothing further.  Thank you.
12                MR. GRIMM:  Nothing further.
13                THE COURT:  Thank you very much, Dr. Fenton.
14   You're excused.
15                THE WITNESS:  Thank you.
16                THE COURT:  All right, it's now too late to have
17   Ms. English come back, I think.
18                MR. CASSELMAN:  Well, it all the depends on the
19   Court.
20                THE COURT:  I thank the ladies and gentlemen of
21   the jury for your patience.  And tomorrow we have how many
22   witnesses, two or three?
23                MR. CASSELMAN:  Well, I think two, in my case,
24   maybe we're halfway through one of them.
25                THE COURT:  And you have one other who cannot come
```